**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSLYVANIA**

MOLLY CRAMER,

Plaintiff,

v.

NETFLIX, Inc. and
ROYAL GOODE PRODUCTIONS, LLC,

Defendants.

Civil Action No. 3:22-cv-131
Honorable Judge Stephanie L. Haines

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff Molly Cramer ("Plaintiff") respectfully submits this Supplemental Brief in opposition to Defendants Netflix, Inc. and Royal Goode Productions (collectively "Defendants") motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

On June 5, 2023, the Court ordered that the parties submit Supplemental Briefs to address the impact on this case of the recent Supreme Court ("the Court") decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith et al.*, 598 U.S. 1, 38 (2023) ("*AWF v. Goldsmith*").

## *AWF V. GOLDSMITH*

### I. Brief Summary of the Case

Lynn Goldsmith is an award-winning photographer whose work captured some of the 20th century's greatest rock stars: Bob Dylan, Mick Jagger, Patti Smith, Bruce Springsteen, and Prince. In 1984, Goldsmith agreed to license her photograph of Prince to Vanity Fair to be used as an

"artist reference" for Andy Warhol on the condition that it would be used "one time only." Warhol made a silkscreen of the photo which was published in Vanity Fair alongside an article about Prince. Goldsmith was credited for the photo and received $400.

Warhol, however, proceeded to create 15 additional works (13 silkscreens and two pencil drawings) from the Goldsmith photo (named the "Prince Series"), unbeknownst to Goldsmith. In 2016, after Prince's death, Condé Nast approached the Andy Warhol Foundation for the Visual Arts, Inc. ("AWF") to license the original silkscreen published in 1984 in Vanity Fair. Although AWF wanted Condé Nast to license the entire Prince Series, Condé Nast instead licensed one of the 13 additional silkscreens (named "Orange Prince"), which was published in Condé Nast's magazine in 2016. AWF received $10,000, and Goldsmith neither was credited nor received any money.

## II. The District Court and Court of Appeals Opinions

Goldsmith did not know about the Prince series until 2016 when she saw Orange Prince on the cover of the Condé Nast magazine. Goldsmith notified AWF of her belief that it had infringed her copyright. AWF sued Goldsmith for declaratory judgment of noninfringement or in the alternative fair use, alleging that the Prince Series works were "transformative" and that the first fair use factor, i.e., the purpose and character of the use, weighs in its favor because the works convey a different meaning or message than the photograph. Goldsmith counterclaimed for infringement. The District Court considered the four fair use factors and granted AWF summary judgment on its defense of fair use. The Court of Appeals for the Second Circuit reversed and remanded, finding that all four fair use factors favored Goldsmith. 11 F. 4th 26, 54 (2021). The Court of Appeals stated that "the overarching purpose and function of the two works at issue … is identical, not merely in the broad sense that they are … works of visual art but also in the narrow

but essential sense that they are portraits of the same person. *Id*., at 42. The Court of Appeals also rejected the District Court's holding that "'each Prince series work'" is transformative because it "'is immediately recognizable as a "Warhol,"' which the Court of Appeals believed would "create a celebrity-plagiarist privilege." *Id*., at 43.

## III. The Supreme Court Decision

### A. The Sole Question Before the Court

The only question before the Court was "whether the court below correctly held that the first fair use factor, 'the purpose and character of the use,' including whether such use is of a commercial nature or is for nonprofit educational purposes,' § 107(1), ways in Goldsmith's favor." *AWF v. Goldsmith,* at 12.

### B. First Fair Use Factor a Matter of Degree and Weighed Against Other Factors

The Court reiterated its holding in *Campbell v. Acuff-Rose Music, Inc*. 510 U.S. 569, 579 (1994) that the first fair use factor "focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism." *Id.* (quoting *Campbell,* at 579. Importantly, the Court stated that "[a]lthough new expression may be relevant to whether a copying use has a sufficiently distinct purpose or character, it is not, *without more*, dispositive of the first factor (our emphasis added). " *Id*.

### C. Fair Use is a "Flexible" Concept and Requires "Judicial Balancing"

The Court referenced Congress' 1976 codification of the common law doctrine of fair use under § 107, which provides: "[T]he fair use of a copyrighted work, … for purposes such as criticism, comment, news reporting, teaching, …scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The Court pointed out, however, as it had previously in *Google*

*LLC v. Oracle America, Inc*. 593 U.S. ___,___ (2021) (slip op. at 14), that the "Act's fair use provision … 'set[s] forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances'". *Id.*, at 14. The Court reiterated its holding in *Google*, stating that "[b]ecause those principles apply across a wide range of copyrightable material … , fair use is a 'flexible' concept and 'it's application may well vary depending on context. For example, in applying the fair use provision, 'copyright's protection may be stronger where the copyrighted material … serves an artistic rather than a utilitarian function. *Id.* (*Google,* slip op. at 15).

D. Transformative Use: Does New Work Supersede or Add Something New to Original Work?

The Court stated that the first fair use factor "considers the reasons for, and nature of, the copier's use of an original work." *Id*., at 15. As it did in *Campbell* at 579, the Court stated that the central inquiry is "whether the new work merely supersede[s] the objects of the original creation … ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Id*. Thus, the Court stated that "the first factor relates to … substitution … [and thus] [t]he use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or "'supplan[t]'" the work. *Id*.

Further, the Court reaffirmed its finding in *Campbell*, namely, that "[m]any secondary works add something new. That alone does not render such use as fair. Rather, the first factor … asks '*whether and to what extent*' the use at issue has a purpose or character different from the original (emphasis added)." *Id*., at 16 . "The larger the difference, the more likely the first factor ways in favor of fair use. The smaller the difference, the less likely." *Id*.

In determining the contours of what constitutes transformative use, the Court stated it is a "use that has a further purpose or different character" [and] that 'transformativeness' is a matter of degree'" *Id*. (quoting *Campbell* at 579).

Importantly, however, the Court cautioned that "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works. To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id*.

E. <u>Commercialism and Justification</u>

The Court pointed out, as it did in *Campbell* at 584, that the first fair use factor includes two important elements: the commercial nature of the use and justification for the use. "First, the fact that a use is commercial as opposed to nonprofit is an additional element of the first factor. *Id*., at 18. Although "the commercial nature of the use is not dispositive … it is relevant" … and "is to be weighed against the degree to which the use has a further purpose or different character." *Id*.

Second, "the first factor also relates to the justification for the use … in that a use that has a distinct purpose is justified because it furthers the goal of copyright." *Id*. Further, the Court stated that a use that shares the purpose of a copyrighted work is more likely to provide the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it, which undermines the goal of copyright. *Id*., at 19. Two examples of what constitutes justified use of a copyrighted material stated by the Court is parody ("needs to mimic an original to make its point"); and commentary or criticism that targets an original work, in that "[there] may [be] a compelling reason to use the original by borrowing from it." *Id.*

Although the court acknowledged that *Campbell* "describes a transformative use as one that 'alter[s] the first [work] with new expression, meaning, or message,'" *Id*., at 28 (quoting *Campbell*, at 579), the Court stated that "Campbell cannot be read to mean that § 107(1) weighs in favor of *any use* that adds some new expression, meaning, or message … [o]therwise, 'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works … that 'recast, transform, or adapt the original,' § 101, add new expression, meaning or message, or provide new information, new aesthetics, new insights and understandings." *Id.*

Further, the Court stated that "[t]he first fair use factor would not weigh in favor of a commercial remix of Prince's 'Purple Rain' just because the remix added new expression or had a different aesthetic. A film or musical adaptation, like that of Alice Walker's The Color Purple, might win awards for its 'significant creative contribution;' alter the meaning of a classic novel; and add 'important new expression' such as images performances original music and lyrics." *Id*., at 29 (quoting *Post*, at 11, 23 (KAGAN, J., dissenting), "[b]ut that does not in itself dispense with the need for licensing." *Id*.

Importantly, the Court, in noting AWF's assertion that the use by Warhol of Goldsmith's photo was transformative because Warhol used the photo to comment on the "dehumanizing nature" and "effects" of celebrity, held that even if such commentary is perceptible on the cover of Condé Nast's tribute to Prince, the asserted commentary has no critical bearing on Goldsmith's photo. Thus, AWF's "claim to fairness in borrowing from her work diminishes accordingly (if it

does not vanish) … [while] the commercial nature of the use on the other hand looms large." *Id.* at 34.

F. Summary of the Court's Holding in *AWF v. Goldsmith*

In sum, the Court held that "if an original work and secondary use share the same or highly similar purposes, and the secondary use is commercial, the first fair use factor is likely to weigh against fair use, absent some other justification for copying." *Id.*, at 20. The Court opined that "if the last century of American art, literature, music, and film is any indication, the existing copyright law, of which today's opinion is a continuation, is a powerful engine of creativity." *Id.*, at 37. Further, "[i]t will not impoverish our world to require [a secondary user] to pay [the owner of the original work] a fraction of the proceeds from its reuse of [the] copyrighted work. Recall, payments like these are incentives for artists to create original works in the first place. Nor will the Court's decision, which is consistent with long standing principles of fair use, snuff out the light of western civilization, returning us to the dark ages of a world without Titian, Shakespeare, or Richard Rogers." *Id.*, at 36.

Thus, the Court's decision in *AWF v. Goldsmith* will no doubt have the effect of enshrining the first of the four factors in the fair use test as the most important measure for adjudicating copyright infringement claims.

## ARGUMENT

### IV. Transformative Use Cannot Be Used By Defendants as a Defense for their Copying of Plaintiff's Artwork

A. Further Purpose and Different Character of Defendants' Use is Weak and Not Outweighed by Other Factors

As acknowledged by Defendants as Plaintiff's purpose for creating her tattoo artwork

("Plaintiff's artwork" or "her artwork")[1], Plaintiff created her artwork of Joe Exotic because she "believed that because of Joe Exotic's popularity, notoriety, and global recognition, such a funny picture of Joe Exotic for tattooing on her husband would receive a very large response by the public for the online sale of … gift certificates.[2]

Defendants' assert that its use of Plaintiff's artwork "is clearly transformative" from "Cramer's expressly stated purpose … to capitalize on Joe Exotic's notoriety to sell gift certificates … which "bears no relation to the Defendants' purpose of documenting the life story of Joe Exotic and, in particular, showing the zealotry of his fans."[3] Defendants further allege that its use of Plaintiff's artwork "has an entirely new and different, biographical purpose, as well as a different meaning and message, namely, helping to show that Joe Exotic accumulated a mass following of fanatical viewers."[4]

Plaintiff contends that Defendants' stated purpose of documenting the life story of Joe Exotic and, in particular, showing the zealotry and fanatical nature of his fans; and helping to show that Joe Exotic accumulated a mass following of fanatical viewers, cannot even remotely be considered largely different, i.e., "clearly transformative" as asserted by Defendants,[5] from Plaintiff's purpose of creating her artwork.

Plaintiff points out that although the first fair use factor focuses on whether an allegedly infringing use has a further purpose or different character, which as the Court stated is a matter of degree that must be weighed against other considerations, like commercialism, and that "new expression *may* be relevant to whether a copying use has a sufficiently distinct purpose or

[1] *See* Motion to Dismiss at pg.1, ¶3
[2] See Complaint ("Compl.") at ¶12
[3] *See* Motion to Dismiss at pg.2, ¶2
[4] Ibid.
[5] Ibid.

character, [however] it is not, *without more*, dispositive of the first factor (our emphasis added). *AWF v. Goldsmith,* at 12.

Thus, without more, Defendants' further purpose and different character cannot be considered dispositive of the first fair use factor. Further, because Plaintiff contends that Defendants' use of the Plaintiff's artwork has a highly similar purpose to that of Plaintiff's artwork, the commercial nature of Defendants' use of Plaintiff's artwork takes on greater importance in determining whether Defendants' use was transformative. Here, Defendants' use of Plaintiff's artwork can only be characterized as monumentally commercial in nature (need we mention the overwhelming success of the Tiger King series and the billions of dollars in revenue generated therefrom, and the fact that it is still streaming on Netflix with Plaintiff's artwork **still** being used?), even though Defendants wish this Court to view the making of the Tiger King series solely as "commentary, criticism, and reporting"[6] to justify their allegedly infringing use of Plaintiff's artwork.

In addition, Defendants' argument regarding their further purpose and different character in their allegedly infringing use of Plaintiff's artwork is further weakened by the fact that Plaintiffs' artwork serves an artistic rather than a utilitarian function which, according to the Court, strengthens Plaintiff's copyright protection of her artwork. *Id*., at 14.

B. Defendants Use Supersedes and Does Not Add Something New to Plaintiff's Artwork

Defendants allege that their "use has an entirely new and different, biographical purpose, as well as a different meaning and message, namely, helping to show that Joe Exotic accumulated a mass following of fanatical viewers."[7] Plaintiff contends that this alleged "new purpose" is not

[6] See Motion to Dismiss at pg. 15, ¶2
[7] See Motion to Dismiss at pg. 9, ¶6

new at all, as Plaintiff's stated purpose for choosing Joe Exotic to create her artwork was because of Joe Exotic's notoriety, global recognition, fame, and number of fanatical viewers. Even if one were to concede that Defendants' allegedly infringing use added "something new" to Plaintiff's artwork (which Plaintiff does not at all concede), the Court stated that "that alone does not render such use fair [because] [m]any secondary works add something new." *Id.* at 16. The inquiry, rather, is to "*what extent* the use … has a purpose or character different from the original" (our emphasis added). *Id.* Here, Plaintiff submits that there is little difference between Plaintiff's stated purpose of creating her artwork and Defendants' stated purpose for their alleged infringing use of her artwork, and thus Defendants' use of Plaintiff's artwork in the Tiger King series can only be considered to supersede, or supplant, Plaintiff's artwork, not transform it. Indeed, to come to any other conclusion would allow an "overbroad" concept of transformative use that the Court cautioned against, namely, "one that includes *any* further purpose, or *any* different character [which] would narrow the copyright owner's exclusive right to create derivative works. To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative [work]." *Id.*

C. Commercial Nature of Use With No Justification Far Outweighs Assertion of Transformative Use

Defendants' sole argument in alleging fair use of Plaintiff's artwork in the Tiger King series is that their use is "plainly transformative."[8] However, Defendants' assertion that their use is "plainly transformative" leaves out the two important elements highlighted by the Court that must be weighed in determining whether the use is transformative, i.e., commercial nature of the use and justification for the use.

[8] *See* Motion to Dismiss at pg.8, ¶3

The first element Plaintiff addressed above, namely, the enormous commercialism of the use of Plaintiff's artwork by Defendants. This element, when weighed against the degree of Defendants alleged transformative use of Plaintiff's artwork, clearly eviscerates Defendants' use of transformativeness as a defense for their use of Plaintiff's artwork.

The second element, justification for the use, similarly fails to strengthen Defendants' feeble attempt to use transformativeness as a defense against their alleged infringement of Plaintiff's artwork. Examples of justified use given by the Court include criticism, commentary, news reporting, teaching, scholarship, *Id*., at 14, and parody, *Id*., at 19. Plaintiff submits that **not one** of these justifications can even remotely apply to Defendants' allegedly infringing use of Plaintiff's artwork. Indeed, it strains credulity for Defendants to assert that their purpose for using Plaintiff's artwork was in the service of criticism, commentary or news reporting.[9] Indeed, as the Court held in *AWF v. Goldsmith,* at 34, even if criticism, commentary or news reporting was Defendant's alleged purpose in using Plaintiff's artwork (which Plaintiff does not at all concede), such alleged purpose has no critical bearing on Plaintiff's artwork, and Defendants' claim to fairness in using Plaintiff's artwork diminishes, if not vanishes, while the commercial nature of the use on the other hand looms large.

Thus, in contrast to Defendants' assertion of transformative use, Plaintiff submits that the Tiger King "documentary" series was a multimillion dollar production clearly created for the purpose of exploiting the notoriety, global recognition, fame, and zealous popularity of Joe Exotic for commercial gain; a purpose not at all dissimilar from Plaintiff's purpose for creating her artwork, namely, to capitalize on Joe Exotic's popularity, notoriety, fame, and global recognition in order to sell gift certificates. Any other purpose that Defendants would like this Court to believe

[9] *See* Motion to Dismiss at pg. 11, ¶1

as to why they used Plaintiff's artwork in the Tiger King series can only be seen as a lame and, Plaintiff submits, futile attempt to justify their allegedly unlawful use of Plaintiff's copyright protected artwork.

## V. Conclusion

In light of the reasons stated hereinabove, Plaintiff respectfully asks that Defendants' Motion to Dismiss be denied.

Dated June 15, 2023

Respectfully Submitted,

/s/Gwen R. Acker Wood

Gwen R. Acker Wood, (PA. State Bar No. 89081)
ACKER WOOD Intellectual Property Law, LLC
4981 McKnight Road
Pittsburgh, PA 15237
Tel: (412) 486-1038
Fax: (412) 487-2837
grwood@ackerwoodiplaw.com

*Attorney for Plaintiff Molly Cramer*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, I electronically filed the foregoing **PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS'MOTION TO DISMISS** with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

June 15, 2023

/s/ Gwen R. Acker Wood