## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MOLLY CRAMER,                              )
                                      )
     Plaintiff,                           )
                                        )
              v.                       )         Civil No. 3:22-cv-131
                                        )         Judge Stephanie Haines
NETFLIX, Inc. and                          )
ROYAL GOODE PRODUCTIONS, LLC,   )
                                        )
     Defendants.                         )

### OPINION

Plaintiff Molly Cramer ("Plaintiff") commenced this copyright infringement action by filing a Complaint (ECF No. 1) against Defendants Netflix, Inc. ("Netflix") and Royal Goode Productions, LLC ("Royal Goode") (collectively, "Defendants"). Currently pending before the Court is Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 14) and Brief in Support (ECF No. 17). Defendants also filed a Request for Judicial Notice in Support of their Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 19), with the consent of Plaintiff's counsel, wherein Defendants request that the Court take judicial notice of the contents of a DVD/USB flash drive containing the first episode of the second season of the "Tiger King" reality-based series (the "Episode") which is streamed on Netflix.

On February 13, 2023, Plaintiff filed a Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 26) and Motion in Opposition to Defendants' Motion to Dismiss Complaint (ECF No. 27), and Defendants filed a Reply (ECF No. 28) thereto. Pursuant to the Court's Order (ECF No. 29), on June 15, 2023, the parties both filed supplemental briefs (ECF Nos. 30 and 31) to address the impact of the Supreme

Court's recent decision on copyright infringement in the case *Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023). The matter is ripe for disposition.

The Court will grant the request to take judicial notice of the Episode, and the video of the Episode is hereby part of the record before the Court on this matter. For the reasons stated below, the Court will GRANT Defendants' Motion to Dismiss (ECF No. 14) and dismiss this matter with prejudice.

## I.    Factual and Procedural History

Except where otherwise noted, the following facts are drawn from Plaintiff's Complaint (ECF No. 1), the Episode, and the other documents of record in this matter. All facts alleged in Plaintiff's Complaint (ECF No. 1) are assumed to be true for purposes of the pending Motion to Dismiss (ECF No. 14).

### A.   The Tattoo

At the onset of the COVID-19 pandemic in March 2020, Plaintiff's husband, Noah Cramer, came up with the idea of creating a contest to sell gift certificates online to raise money to support the tattoo business owned by himself and Plaintiff, which had closed as a result of the pandemic (ECF No. 1 at ¶12). In the contest, purchasers of gift certificates could vote on one of several funny tattoo pictures created by Plaintiff, and the winning picture would then be tattooed by Plaintiff onto her husband's thigh. *Id.*

One of the tattoo pictures created by Plaintiff for the contest was a depiction of the face of "Joe Exotic," along with a Lysol brand aerosol can, illustration of five COVID-19 viruses, and a toilet paper banner with the words "Quarantine 2020." *Id.* Plaintiff and her husband had seen the first season of the reality-based Tiger King series produced by Royal Goode that was streaming on Netflix. *Id.* As described by Plaintiff, the first season of the Tiger King series deals with the

life of former zookeeper and convicted felon "Joe Exotic," also known as "The Tiger King," whose real name is Joseph Allen Maldonado-Passage ("Joe Exotic"). *Id.* As aptly summarized by the Western District Court of Oklahoma:

> "....its subtitle [*Tiger King: Murder, Mayhem and Madness*] is not hyperbole. The series features several individuals who own tigers and other exotic animals, but mainly focuses on the Tiger King himself - Joe Exotic - and his acrimonious rivalry with self-styled animal activist Carole Baskin."

*Whyte Monkee Prods. v. Netflix, Inc.*, No. CIV-20-933-D, 2022 WL 1251033 (W.D. Okla. Apr. 27, 2022).

Plaintiff alleges she created her tattoo artwork of Joe Exotic because she "believed that because of Joe Exotic's popularity, notoriety, and global recognition, such a funny picture of Joe Exotic for tattooing on her husband would receive a very large response by the public for the online sale of ... gift certificates." *Id.* Between March 29, 2020 and April 3, 2020, Plaintiff sold the gift certificates on her Facebook page and garnered close to $4000.00, which allowed her to reopen her tattoo business. *Id.* at ¶¶13-14. The Joe Exotic tattoo received the most votes, and on April 5, 2020, Plaintiff tattooed the Joe Exotic artwork on her husband (the "Tattoo") and posted the below picture on her Facebook page of the tattoo the same day. *Id.* at ¶¶13-14.



(ECF No. 1-1).

**B. The Episode**

As previously stated, Defendants, with the consent of Plaintiff's counsel, submitted to the Court the first episode of the second season of the "Tiger King" documentary series, which is streamed on Netflix. The Court has viewed the Episode in its entirety and the following summary is relevant to its analysis.

The first six seconds of the Episode showed a view of earth from the darkness of space, which is then replaced with a dimly lit hall of computers and the words "Regional Data Center Undisclosed Location" on the center of the screen, followed by the words "March 19, 2020" (0:19). A digital map of the United States appeared, with circles rippling out of various pinpoints on the map and the words "Stay-at-home Orders Begin to Spread Across the United States" shown on the screen (0:26). A clock then ticks down and an image with a tv screen flashing with static appeared (0:33). Clips of Season 1 of Tiger King are then played, featuring Joe Exotic introducing himself and tigers, Thunder and Lightning, at one of his live shows (0:37), followed by video of Carole Baskin introducing herself (0:41).

A depiction of computer code flashes and the screen pans through a series of wires (0:45) as Joe Exotic's voice is heard saying "Animal people are nuts, man, and I might be one of those people." A 3-way split screen then appeared with three different videos from the popular social media platform TikTok showing dancers (0:50). The screen quickly zoomed out to then display approximately 27 TikTok videos depicting dancers, the majority of which are dressed as Joe Exotic or are wearing animal print clothing (0:53). This screen is then replaced with a video of Donald Trump, which appears to be taken from a press conference when he was president. President Trump is shown questioning "Is that Joe Exotic? That's Joe Exotic?" (0:55).

Then at 58 seconds into the Episode, the below 8-way split screen montage appears:



(ECF No. 17 at p. 9).

The Tattoo is seen at the lower left corner of the screen for approximately 2.2 seconds. The voice of podcast personality Joe Rogan is played over the images, asking "Have you heard about this crazy dude who is in a battle with this lady who may have fed her ex-husband to tigers?" and the 8-way split screen montage is then replaced with a video of Rogan recording his podcast (1:00). The video of Rogan is then replaced by another split screen of 8 images which compiled images relating to Carole Baskin (1:02). This split screen is then quickly replaced with a parody video of Carole Baskin (1:05). Videos appeared of a person painting a mural of Joe Exotic and a tiger (1:07), a car driving down the road that was custom painted to read "Free Joe Exotic," and a bus that was painted to read "President Trump Please Pardon Joe Exotic" (1:15).

Another parody video then appeared, this time showing actor David Spade dressed as Joe Exotic making a phone call from prison. An image of a secure prison is then shown, surrounded by barbed wire, which cut to a phone interview with the actual Joe Exotic from federal prison (1:30). The phone call was clearly made after the premier of the first season of Tiger King on Netflix, as Joe Exotic lamented that it would be nice if he could see himself being famous but all he has seen for the past year and half are the four walls of his prison facility. At 2:59, the credits

for the episode, entitled "Beg Your Pardon" begin to roll.  The Episode lasts for almost 40 more minutes.  It first shows the current whereabouts of the individuals from Season One of the Tiger King series, recounting their perspectives on Joe Exotic's criminal conviction for animal abuse charges and the murder-for-hire plot directed at Carole Baskin.  The remainder of the Episode then focuses on the various individuals who have taken up Joe Exotic's quest to obtain a pardon from then President Trump.  Plaintiff alleges the Tattoo is shown about two minutes into the episode for about three seconds (ECF No. 1 at ¶16).

### C. Infringement Allegations

On November 19, 2021, one day after the premier of the Episode, Plaintiff alleges she started receiving phone calls and texts from friends and clients telling her that they saw Plaintiff's Tattoo on the episode.  *Id.*  On November 29, 2021, ten days after the Episode premiered, Plaintiff and her husband sent a letter to Joe Exotic to ask for his permission to use the Tattoo and to continue posting a picture of the Tattoo on Plaintiff's social media.  *Id.* at ¶17.  On or about December 17, 2021, Plaintiff received Joe Exotic's consent to the use of his likeness in the Tattoo and on social media (ECF No. 1-3).

On January 11, 2022, Plaintiff then sought and obtained a federal copyright registration, afforded number VA-228504, for the Joe Exotic tattoo, which was titled "Quarantine 2020" (ECF No. 1-5).  On February 9, 2022, Plaintiff's attorney sent a cease-and-desist letter to Defendant Netflix's Chief Legal Officer, David Hyman, with respect to its unauthorized use of the Tattoo, requesting, inter alia, that Netflix immediately remove the infringing photo of the Tattoo from the episode (ECF No. 1-6).  Plaintiff demanded payment of $10 million dollars in the cease-and-desist letter to settle the infringement claim.  *Id.*

Netflix declined to pay Plaintiff $10 million dollars and asserted that its use of the Tattoo was not a violation of the Copyright Act under the fair use doctrine (ECF No. 1-7). The parties' attorneys exchanged several letters on these issues, including one letter in which Plaintiff reduced her demand to $50,000.00, but Netflix continued to assert that Plaintiff was not entitled to compensation (ECF Nos. 1-8 to 1-11).

Plaintiff then filed the instant lawsuit, alleging a single count of copyright infringement and seeking all damages she suffered as a result of Defendants' willful and intentional copyright infringement to the fullest extent allowed by law. The allegedly infringing photo of the Tattoo still is shown in the Episode, without reference or attribution to Plaintiff (ECF No. 1 at ¶26).

## II.    Legal Standard

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 664. To avoid dismissal, plaintiffs "must allege facts to 'nudge [their] claims across the line from conceivable to plausible.'" *Mann v. Brenner*, 375 F. App'x 232, 235 (3d Cir. 2010) (quoting *Twombly,* 550 U.S. at 570).

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations

that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. In this regard, legal conclusions must be supported by factual allegations. *Id.*; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth"). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

As to the record the Court may consider at this stage in the proceedings, the copyrighted and allegedly infringing works will necessarily be integral to an infringement complaint and are therefore properly considered under Rule 12(b)(6). *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018); *see also, Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (district court may consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). Here, as previously stated, Defendants, with the consent of Plaintiff's counsel, requested that the Court take judicial notice of the Episode, and the Court has done so. *See generally In re: Rockefeller Center Properties, Inc. Securities Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (on motion to dismiss, district court may consider certain narrowly defined types of material without converting motion to dismiss to summary judgment motion, including items that are integral to or explicitly relied upon in the complaint).

### III.    Analysis

The Copyright Act confers a copyright owner with the exclusive right to reproduce a copyrighted work and to distribute copies of the work. *See* 17 U.S.C. § 106(1)-(3). "[T]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv.*

*Co., Inc.*, 499 U.S. 340, 361 (1991). A claim of copyright infringement is subject to certain statutory exceptions, including the "fair use" exception, which provides that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. Defendants argue Plaintiff's claim should be dismissed under the fair use exception. In opposition, Plaintiff argues that Defendants' use of the Tattoo does not meet the fair use exception, or alternatively, that judgment in favor of Defendants on that basis is premature at this stage in the proceedings.

### A. Fair Use Doctrine

"Fair use is an affirmative defense, and therefore Defendant bears the burden of showing that a given use is fair." *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019) (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015)). The following four factors must be considered in determining whether the use made of a work in any particular case is fair use:

1. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. the nature of the copyrighted work;
3. the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4. the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The four statutory factors "do not represent a score card that promises victory to the winner of the majority." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 198 (3d Cir. 2003) (internal citation omitted). Rather, each factor is "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) (citations omitted).

### 1.    Purpose and Character of the Use

There are no disputes as to Plaintiff's or Defendants' alleged purpose in using the Tattoo. Plaintiff pleads that she "believed that because of Joe Exotic's popularity, notoriety, and global recognition... a funny picture of Joe Exotic for tattooing on her husband would receive a very large response by the public for the online sale of the gift certificates" (ECF No. 1 at ¶12).  Her stated purpose for creating the Tattoo was "to capitalize on Joe Exotic's popularity, notoriety, fame, and global recognition in order to sell gift certificates" (ECF No. 30 at p. 11).  Defendants' stated purpose for using the image of the Tattoo was to "include images and footage from some of the more strange online postings relating to the [Tiger King] Series and to Joe Exotic, as a means to give the audience a sense of the nature and scale of the public's bizarre reaction to the Joe Exotic phenomenon" (ECF No. 17 at p. 13).

This first factor requires courts to consider the extent to which the secondary work is "transformative," as well as whether it is commercial. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 37 (2d Cir. 2021).  Defendants state that their use of the image of the Tattoo "has an entirely new and different, biographical purpose, as well as a different meaning and message, namely, helping to show that Joe Exotic accumulated a mass following of fanatical viewers" and further, that Defendants' use of the image in the context of the 8-way split screen montage and with voice over and visual effects has "integrated a multitude of different images and clips of footage, while adding audio and visual effects to create an entirely new work" (ECF No. 17 at p. 13).  Plaintiff counters that this alleged "new purpose" is not new at all, as Plaintiff's stated purpose for choosing Joe Exotic to create her artwork was because of Joe Exotic's notoriety, global recognition, fame, and number of fanatical viewers, the same as Defendants' purpose.

Plaintiff is correct in that both the Tattoo and the Episode seek to exploit the story of the life of Joe Exotic and his new-found notoriety.  However, this is because Plaintiff admittedly designed her Tattoo with the intent of capitalizing on the mass following first created by Netflix's first season of the Tiger King series and the public's resulting fascination with Joe Exotic ("Plaintiff's stated purpose for choosing Joe Exotic to create her artwork was because of Joe Exotic's notoriety, global recognition, fame, and number of fanatical viewers" (ECF No. 30 at p. 10)).  Plaintiff's tattoo design is undisputedly a byproduct of the cultural phenom created by Season One of Netflix's Tiger King series.  The Tattoo was created to capitalize on the portrayal of Joe Exotic created by Defendants' series, and that is why there is a seeming similarity in purpose, not vice versa.

Moreover, the Court agrees with Defendants that their multi-media use of the image of the Tattoo is a "criticism," "comment," or "reporting," and therefore "not an infringement of copyright." *Campbell*, 510 U.S. at 578 (1994).  The preamble of §107 lists as fair use purposes: "criticism, comment, news reporting, teaching…, scholarship, or research."  Although the examples given are "illustrative and not limitative," they reflect "the sorts of copying that courts and Congress most commonly ha[ve] found to be fair uses," and so may guide the first factor inquiry. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1274 (2023) (citing *Campbell*, 510 U. S., at 577-578 (quoting §101)).

In *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), the Second Circuit Court of Appeals affirmed summary judgment in favor of the defendant publishers of *Grateful Dead: The Illustrated Trip,* a 480–page coffee table book that provided a history of the Grateful Dead through the use of over 2000 images.  In that case, plaintiff claimed to own the copyright to seven of the images which the defendants reproduced without permission. *Id.* at 607.

11

The court concluded that the first factor weighed in the defendants' favor.  Defendants' purpose in using the copyrighted images as historical artifacts to document the Grateful Dead concert events depicted in the book's timeline was plainly different from the plaintiff's dual purposes of artistic expression and promotion when the images were originally used as concert posters to generate public interest in the band's upcoming events.  *Id.* at 609.

Here, the image of the Tattoo appears after a minute plus-long narrative that takes the viewer back in time to the world's plunge into the pandemic, and the subsequent cultural popularity of Defendants' Season One of the Tiger King series.  When the Tattoo is shown, it appears as one fraction of an 8-way split screen montage comprised of other fan art images created by viewers of the series, including an internet meme with Homer Simpson, a fake cover of the teenager "Tiger Beat" magazine cover featuring Joe Exotic, a face merge of Donald Trump's and Joe Exotic's faces, and an image of a fake baseball card showing Joe Exotic as a Detroit Tigers player.  The montage of these fan created images, accompanied by voice over audio and visual effects, is shown for approximately 3 seconds.  The purpose and character of the Defendants' use of the Tattoo is as part of a visual and auditory compilation depicting the public's overwhelming fascination with and reaction to Joe Exotic in the early days of the pandemic, and thus falls into the "criticism," "comment," or "reporting" that is expressly defined as "fair use" under the Copyright Act, 17 U.S.C. § 107.  Defendants' use of the image of the Tattoo in the 8-way split screen montage, in the context of the audio and visual narrative describing the onset of the pandemic and the public's reaction to Season One of the Tiger King series, "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579-80 (1994) (internal citations omitted); 17 U.S.C. § 107(1).

The Supreme Court's recent decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Lynn Goldsmith, et al.*, 143 S. Ct. 1258 (2023) ("*Warhol*") further supports that Defendants' use of the image of the Tattoo is transformative. In *Warhol*, media company Condé Nast paid to license a 1981 photo of musician Prince taken by photographer Lynn Goldsmith on a single-use basis in order to have famous artist Andy Warhol use the photograph to create artwork depicting Prince for a magazine article. Warhol then went on to make several other artworks based on Goldsmith's Prince photograph in different color palettes. In 2016, the Andy Warhol Foundation ("AWF") licensed one of those works, "Orange Prince," to Condé Nast for a *Vanity Fair* commemorative issue featuring Prince following the musician's death. However, Goldsmith owned the copyright to her 1981 photograph and was not compensated for the magazine's use of "Orange Prince." The limited issue before the Supreme Court was whether the Second Circuit Court of Appeals correctly held that the first factor of the fair use doctrine, the purpose and character of the use, weighed in Goldsmith's favor.

The Supreme Court affirmed the Second Circuit's decision and affirmed that the first fair use factor did not favor AWF and that Goldsmith's original 1981 photograph was entitled to copyright protection, even against uses by famous artists like Warhol. The Supreme Court stated that while "Orange Prince" added new expression to Goldsmith's photograph, in the context of the challenged use, the first fair use factor still favored Goldsmith ("As portraits of Prince used to depict Prince in magazine stories about Prince, the original photograph and AWF's copying use of it share substantially the same purpose"; "The purpose of that use is, still, to illustrate a magazine about Prince with a portrait of Prince"). *Id.* at 1273, 1284.

As previously stated, the Supreme Court issued its opinion in *Warhol* while this matter was pending before the Court. The parties then filed supplemental briefs (ECF Nos. 30 and 31) on

*Warhol* pursuant to the Court's Order (ECF No. 29).  Defendants contend that the first fair use factor favors them because their use of the Tattoo image in the Episode falls within the fair use doctrine as stated in *Warhol*.  Plaintiff contends that *Warhol* supports her position because the Tattoo and Defendants' use of the image of the Tattoo in the Episode share the purpose of capitalizing on the fame and notoriety of Joe Exotic for commercial gain.

The Supreme Court instructs that an artist's stated or perceived intent does not dictate whether a work is transformative, but rather "[w]hether the purpose and character of a use weighs in favor of fair use is, instead an objective inquiry into what use was made, i.e., what the user does with the original work." *Id.* at 1284.  Goldsmith's photograph and AWF's use shared substantially the same purpose, namely, to be commercially sold as portraits of Prince in magazine stories about Prince.  In this case, Plaintiff pleads she posted the image of the Tattoo on her husband's thigh to promote her tattoo business and sell gift cards.  Defendants used the image of the Tattoo in a compilation of images with audio and visual effects to show the magnitude of how the general public reacted to Joe Exotic after Season One of the Tiger King series.  Unlike in *Warhol*, Defendants used the image of the Tattoo for a fundamentally different purpose than Plaintiff originally intended.

The difference in purposes is further made apparent by the inability of the Episode to supersede the Tattoo.  The Supreme Court's discussion of Warhol's Soup Cans series is instructive on this issue.  In *Warhol*, the Supreme Court stated that it did not mean that all "derivative works borrowing heavily from an original cannot be fair uses," specifically noting that Warhol's Soup Can series illustrated that distinction.  *Id.* at 1280.  The Supreme Court stated that "[t]he purpose of Campbell's logo is to advertise soup" and "Warhol's canvasses do not share that purpose," instead, the "Soup Cans series uses Campbell's copyrighted work for an artistic commentary on

14

consumerism" – an independent purpose to advertising soup. *Id.* at 1281. While the Soup Cans series clearly uses the Campbell's soup logo, the Supreme Court noted that "the use of the copyrighted work not only serves a completely different purpose, to comment on consumerism rather than to advertise soup, it also 'conjures up' the original work to 'she[d] light' on the work itself, not just the subject of the work." *Id.* at 1281 (citing *Campbell*, 510 U. S., at 579). Such a use "therefore does not supersede the objects of the advertising logo." *Id.* In a footnote, the Supreme Court suggested that the "situation might be different if AWF licensed Warhol's Soup Cans to a soup business to serve as its logo. That use would share much the same purpose of Campbell's logo, even though Soup Cans has some new meaning or message." *Id.* at 1281, n.15.

Like the Soup Cans series, Defendants are not in the business of selling or advertising tattoos. Plaintiff admittedly created her Tattoo for the purpose of driving income to her business. Defendants' use of the image of the Tattoo for 3 seconds as part of the 8-way split screen montage was for the purpose of showing the public reaction to Joe Exotic after Season One of Tiger King. Defendants' use of the image of the Tattoo is independent from Plaintiff's original purpose, and Defendants' use neither supersedes the object of the Tattoo nor serves as a substitute. In view of the above, the Court finds that the first fair use factor weighs strongly in favor of Defendants.

### 2. Nature of Copyrighted Work

The second factor of the fair use analysis requires the Court to consider "the nature of the copyrighted work." 17 U.S.C. § 107(2). Courts consider "(i) whether the work is expressive or creative, ... with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (ii) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch v. Koons*, 467 F.3d 224, 256

(2d Cir. 2006). Here, the parties agree Plaintiff's Tattoo is creative, and that it is published as Plaintiff pleads that she posted the Tattoo on her Facebook page (ECF No. 1 at ¶14).

Recognizing that the work is creative, this factor weighs in favor of Plaintiff. However, the Court gives this factor limited weight as Defendants' use of the image of the Tattoo is transformative within the meaning of the first factor. *See Bill Graham*, 448 F.3d at 612 ("the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose"); *See also Blanch*, 467 F.3d at 257 ("[T]he second fair-use factor has limited weight in our analysis because Koons used Blanch's work in a transformative manner.").

### 3. Amount and Substantiality of the Portion Used

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" are reasonable in relation to the purpose of the copying. 17 U.S.C. § 107(3). "There is no bright line separating a permissible amount of borrowing from an impermissible one indeed, we have rejected the proposition that this factor necessarily favors the copyright holder even where the secondary user has copied the primary work *in toto* in service of a legitimate secondary purpose." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 46 (2d Cir. 2021) (citing *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 89-90 (2d Cir. 2014)).

Courts often examine this factor's relationship to the other factors in order to determine whether the third factor favors fair use. *See Campbell*, 510 U.S. at 587-88 ("whether 'a substantial portion of the infringing work was copied verbatim' from the copyrighted work is a relevant question…for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use,

fulfilling demand for the original.") (quoting *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U.S. 539, 565 (1985)); *Bill Graham,* 448 F.3d at 613 ("the third-factor inquiry must take into account that the 'the extent of permissible copying varies with the purpose and character of the use.'") (quoting *Campbell*, 510 U.S. at 586-87).

The image of the Tattoo is shown in the Episode in its entirety, though the image is less than life-size, depicted along with seven other images on screen, and shown for less than 3 seconds. Nonetheless, Defendants clearly use the whole image of the Tattoo as it was originally posted on Facebook by Plaintiff.  Defendants argue that taking the entire image of the Tattoo was necessary for its transformative purpose of commenting on the public's reaction to Season One of the Tiger King series, specifically, to show the lengths viewers have gone to associate themselves with Joe Exotic, i.e., getting a tattoo of Joe Exotic's face.

The Court finds the use of the entire image of the Tattoo in the 8-way split screen montage, with visual and audio effects, is appropriate to Defendants' transformative purpose of showing the public's reaction to Season One of the Tiger King series. *See Authors Guild*, 804 F.3d at 221 (2d Cir. 2015) ("not only is the copying of the totality of the original reasonably appropriate to Google's transformative purpose, it is literally necessary to achieve that purpose.").  Further, as discussed in greater depth below, the Court also finds that Defendants' use does not serve as a market substitute or "fulfill the demand" for the original or its derivatives.  Defendants' use of the Tattoo in the Episode does not create a likelihood of market harm for the Tattoo or Plaintiff's ability to sell gift cards or drive income to her business.  Accordingly, the Court finds the third factor favors fair use.

### 4. The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

As noted in the montage, one of the most memorable quotes from Tiger King Season One was Joe Exotic uttering that he would be financially ruined after a tiger mauls one of his employees. The fourth factor of the fair use doctrine does not require a party to demonstrate financial ruin, but instead evaluates "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. §107(4).  In analyzing the fourth factor, courts have made it "clear that [it] is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work." *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013) (internal quotation omitted).  "[T]he possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original.  There must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'"  *Authors Guild*, 804 F.3d at 224 (2d Cir. 2015) citing 17 U.S.C. § 107(4).

Defendants contend that the fourth factor also favors fair use because the 3 second montage of images, showing the image of the Tattoo in reduced size in a corner of the screen, is plainly no substitute for the original Tattoo.  Plaintiff argues that the number of online viewers of the Episode far exceeds the number of views of Plaintiff's social media posts of the Tattoo.  The Tattoo is thus being held out as belonging to the Defendants, not Plaintiff, thereby "usurping" any desire of the public to seek out the true creator of the Tattoo and depriving Plaintiff from realizing the just and fair profit and resultant fame, popularity, and publicity from the creation of the Tattoo (ECF No. 26 at p. 11).

Again, based on the record the parties have submitted to the Court, Plaintiff sells tattoos and gift cards for her tattoo business, and Defendants sell a streaming media service.  Plaintiff's

theory fails to support that Defendants' use has a meaningful or significant effect upon the potential market for or value of the Tattoo. As to social media posts, Plaintiff's image of the Tattoo allegedly appears as a static depiction of the Tattoo on her husband's body whereas Defendants use the image of the Tattoo in a visual and auditory amalgamation of images that flashes for 3 seconds in the Episode. Moreover, as Defendants point out, Plaintiff does not argue that less people are in the market for her tattoos because of the image being shown in the Episode. Plaintiff and Defendants have wholly unrelated products and different marketing channels, which is particularly evident when compared to the use at issue in *Warhol* where AWF and Goldsmith had substantially the same purpose of commercial licensing the portraits of Prince to magazines. Defendants' transformative use of the image of the Tattoo in no way usurps the market for the original. Accordingly, the Court finds the fourth factor also favors fair use.

### B. Procedural Posture

It is well established that a court can resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute, *see Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986), but here Defendants are asking the Court to decide fair use on a motion to dismiss. Plaintiff contends that Defendants' fair use argument is premature procedurally. Defendants argue a comparison between the Tattoo and the Episode is all that is necessary for the Court to assess the applicability of the fair use doctrine as a matter of law. Both parties cite to a number of cases that generally support their respective positions regarding the ability of the Court to make a determination on fair use at this stage in the proceedings.

The determination of fair use is an undeniably fact intensive, context specific inquiry. *See Blanch*, 467 F. 3d at 251 (2d Cir. 2006). Moreover, the court cannot engage in the fair use inquiry until it has been presented with "facts sufficient to evaluate each of the statutory

factors." *See Harper*, 471 U.S. at 560 (1985).  The posture of this case is unusual because while Defendant is asking the Court to decide fair use on a motion to dismiss, the parties have submitted to the Court the image of the Tattoo, the documentation supporting Plaintiff's copyright of the tattoo and history of obtaining the copyright, and a full copy of the Episode.

Plaintiff argues Defendants are not entitled to judgment in their favor at this early stage without the aid of discovery, or alternatively, that the Court must consider whether any discovery would inform or aid in the fair use analysis (ECF No. 26 at p. 11).  However, as Defendants correctly point out, Plaintiff fails to cite to *any* example of discovery that is needed, let alone explain how such discovery would aid, inform or be relevant to a fair use analysis.  Further, after giving the issue consideration, the Court is also not independently aware of any discovery that would be relevant to the fair use analysis.  *See Tanksley*, 902 F.3d at 172 (3d Cir. 2018) ("On appeal, [appellant] criticizes the court for rendering its decision [on a motion to dismiss in a copyright infringement case] 'without the benefit of witness testimony, documentary evidence, or expert analysis,'… but fails to explain how any such evidence could have been relevant.  It would not have been."); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 691 (7th Cir. 2012) (affirming district court's dismissal of copyright infringement suit under fair use affirmative defense was appropriate, stating "[d]istrict courts need not, and indeed ought not, allow discovery when it is clear that the case turns on facts already in evidence").

Though this case is in the pleading stage, the parties rely on the Episode and other documents of record in their motions and briefs.  The parties fully briefed the issues before the Court and submitted supplemental briefs to address the impact of the *Warhol* decision.  The record before the Court, which includes the image of the Tattoo, the Episode, and documents relating to Plaintiff's copyright of the Tattoo and pre-litigation correspondence with Defendants, allowed this

Court to conduct its fair use analysis as set forth herein.  Even viewing the copyright infringement allegations in the light most favorable to Plaintiff, it is clear that the Court cannot grant relief under any set of facts that could be proven consistent with the record before the Court.  Accordingly, the Court will enter judgment in favor of Defendants as a matter of law.

### IV.    Conclusion

Based on the foregoing, the Court will grant Defendants' Motion (ECF No. 14) and dismiss Plaintiff's Complaint with prejudice.  The Clerk of Court is ordered to close this matter and enter judgment in favor of Defendants.

An appropriate Order to follow.

DATE: September 18, 2023

Stephanie L. Haines
United States District Judge